1   **WO**

2

3

4

5

6                    **IN THE UNITED STATES DISTRICT COURT**

7                        **FOR THE DISTRICT OF ARIZONA**

8

9   Robert Rozich,                              No. CV-23-00210-PHX-DWL

10               Plaintiff,                       **ORDER**

11   v.

12   MTC Financial Incorporated; First
    Citizens Bank & Trust Company; Loan
13   Care, LLC

14               Defendants.

15

16          Robert Rozich ("Plaintiff") alleges that he contacted his loan servicer, LoanCare,

17   LLC ("LoanCare"), to express concerns regarding his ability to make future payments on

18   a home equity line of credit.  In response, LoanCare told Plaintiff that he would have to be

19   delinquent for three months before he could apply for hardship relief.  However, after

20   Plaintiff went into delinquency based on that advice and then submitted a loan modification

21   application, LoanCare denied relief.  In the denial letters, LoanCare stated that Plaintiff

22   was ineligible for modification because his loan was a secondary lien.

23          In this action, Plaintiff has sued LoanCare (and other defendants) under an array of

24   legal theories.  Now pending before the Court is LoanCare's motion to dismiss all of

25   Plaintiff's claims against it.  (Doc. 25.)  For the following reasons, the motion is granted

26   but Plaintiff is granted leave to amend.

27          …

28          …

**BACKGROUND**

I.    Factual Allegations

The following facts, presumed true, are derived from Plaintiff's operative pleading, the First Amended Complaint ("FAC").  (Doc. 21.)

Former Defendant MTC Financial Incorporated ("MTC") is a California corporation that operates in Arizona.  (*Id.* ¶ 2.)  Defendant First Citizens Bank and Trust Company ("CIT") is a bank that operates in Arizona.  (*Id.* ¶ 3.)  Defendant LoanCare is a company that services loans, including in Arizona.  (*Id.* ¶ 4.)

On July 31, 2007, Plaintiff obtained a $150,000 home equity line of credit ("the HELOC").  (*Id.* ¶¶ 8, 11.)  The HELOC is secured by a deed of trust ("DOT") on Plaintiff's home in Phoenix.  (*Id.*)  In 2010, the DOT was assigned to CIT.  (*Id.* ¶ 10.)  "The DOT was a Secondary Lien, with a Wells Fargo-Home Mortgage having a secured loan in first position."  (*Id.* ¶ 12.)

The "monthly payment for the Wells Fargo-Home Mortgage loan was . . . $1,377."  (*Id.* ¶ 13.)  The "monthly mortgage payment under the HELOC would fluctuate based on the amount of the interest only payments," with an "estimated average per month paid by Plaintiff" of "$1,093.75."  (*Id.* ¶ 14.)

In 2007, "[u]pon obtaining the HELOC, the entire line of credit under the HELOC . . . was placed in Plaintiff's bank account without his permission or knowledge[,] which would require him to pay interest on the entire amount of the HELOC."  (*Id.* ¶ 15.)  Plaintiff "immediately returned the funds to the lender, but already having the interest assessed on the entire amount of the HELOC Plaintiff transferred all of the funds in the HELOC to his account."  (*Id.* ¶ 16.)  "Defendants" then "close[d] the credit line within one . . . year of funding the loan, for reasons not having to do with Plaintiff."  (*Id.* ¶ 17.)[1]

"On or before July of 2018 Plaintiff contacted LoanCare because he foresaw

---

[1]    The Court notes that the allegations in paragraph 16 appear to be contradictory, as the FAC does not explain how Plaintiff could have both immediately returned the funds and kept the funds.  The Court also notes that the vague reference to "Defendants" in paragraph 17 does not identify which of the three Defendants in this action (one of which has since been dismissed) took the alleged action.

difficulties in making future payments on the HELOC." (*Id.* ¶ 18.) "LoanCare informed Plaintiff that he would have to be delinquent three . . . or so months before hardship relief would be granted." (*Id.* ¶ 19.) "LoanCare did not discuss with Plaintiff other options available, including refinance, so that Plaintiff could remain in good standing and continue his monthly payments without issue." (*Id.* ¶ 21.) "Plaintiff never had been delinquent on the payments for the HELOC." (*Id.* ¶ 20.) "Around this time LoanCare removed Plaintiff's access to the online HELOC account," which meant "Plaintiff could not make or review payments and balances online as he always had before." (*Id.* ¶¶ 22-23.) "LoanCare also would charge, at times, a . . . $10 . . . service/processing fee to make payments prior to LoanCare removing Plaintiff's access to the online account." (*Id.* ¶ 24.)

"In September of 2018, Plaintiff submitted his Borrower Response Package/Loss Mitigation Application . . . based on the previous instructions from LoanCare to first allow the HELOC payments to become delinquent and apply for relief." (*Id.* ¶ 25.)

On September 21, 2018, LoanCare responded that Plaintiff's application was incomplete. (*Id.* ¶ 26.) Plaintiff then provided additional information. (*Id.* ¶ 27.)

On or around October 30, 2018, LoanCare confirmed in a letter to Plaintiff that the application was complete but also noted that it "encourage[d] [Plaintiff] to consider contacting servicers of any other mortgage loans secured by the same property to discuss available loss mitigation options." (*Id.* ¶¶ 27, 30.)

On or around November 13, 2018, LoanCare told Plaintiff in a letter that "although [he] may have a hardship, [he] d[id] not qualify for a loan modification." (*Id.* ¶ 32.) The letter stated Plaintiff "was not eligible for a repayment plan, unemployment forbearance, or traditional modification trial, because the HELOC was not a first lien." (*Id.* ¶ 35, internal quotation marks omitted.) Before this letter, "LoanCare had never informed Plaintiff that because the HELOC was not a first lien, Plaintiff would not qualify under any plan," although it "knew at all times the HELOC was in second position." (*Id.* ¶¶ 36-37.)

In March 2019, Plaintiff submitted a second mitigation application. (*Id.* ¶ 38.) On or around April 15, 2019, he received a second rejection letter, which provided the same

1    explanation that was provided in the first rejection letter.  (*Id.* ¶¶ 39, 42.)

2        In November 2019 and April 2020, LoanCare rejected successive applications from

3    Plaintiff for the same reason.  (*Id.* ¶¶ 44-45, 48, 52-53, 56.)

4        In September 2021, Plaintiff enlisted the help of an individual named Charles M.

5    Bartkiewicz to assist him with his fifth application.  (*Id.* ¶¶ 59-62.)  In an October 15, 2021

6    letter, LoanCare informed Bartkiewicz that it "does not offer refinancing," so "the only

7    options for Plaintiff were to reinstate the account . . . , a short sale, or a discounted pay

8    off."  (*Id.* ¶¶ 62-63.)  The October 15, 2021 letter "also for the first time, invite[d] Plaintiff

9    to make a settlement offer for a lien release."  (*Id.* ¶ 64.)  Bartkiewicz then made three

10   settlement offers on Plaintiff's behalf, but none were accepted.  (*Id.* ¶¶ 65-66.)

11       In a May 6, 2022 letter rejecting the second settlement offer, LoanCare stated "that

12   the account remains due for the January 6, 2019, payment and the unpaid principal balance

13   is . . . $126,407.70."  (*Id.* ¶ 66.)  In other words, "LoanCare was taking the position that

14   from July 2007 through December 2018, Plaintiff had only paid . . . $23,592.30 . . . towards

15   the principal."  (*Id.* ¶¶ 66-68.)  "After Plaintiff's online access to his account was revoked

16   by Defendants, Plaintiff has never been provided an accounting showing the basis of the

17   unpaid principal balance as . . . $126,407.70."  (*Id.* ¶ 70.)

18       Plaintiff alleges that "LoanCare and CIT purposely prolonged the period that

19   Plaintiff negotiated with the Defendants so that the Plaintiff would be in considerable

20   arrears which would make his ability to obtain new financing from any institution

21   increasingly difficult to impossible."  (*Id.* ¶ 71.)  "During the entirety of this process,

22   Defendants negatively reported each late payment destroying Plaintiff's good credit

23   rating."  (*Id.* ¶ 72, internal quotation marks omitted.)  Plaintiff further alleges that "[h]ad

24   LoanCare and/or CIT initially told Plaintiff to offer an amount for a discounted payoff and

25   release of lien instead of advising [him] to resubmit multiple applications, then either a

26   settlement could have been reached or Plaintiff would still have been in a position to obtain

27   new financing with CIT or [an]other lender based on his then good credit and equity."  (*Id.*

28   ¶ 73.)

1  II.   Procedural History

2        On December 13, 2022, Plaintiff commenced this action in Maricopa County

3  Superior Court.  (Doc. 1 ¶ 1.)

4        On January 31, 2023, LoanCare removed the action to this Court.  (Doc. 1.)

5        On March 9, 2023, after Plaintiff and MTC announced they had reached a settlement

6  (Doc. 16), the Court dismissed all of Plaintiff's claims against MTC.  (Doc. 18.)

7        On April 7, 2023, Plaintiff filed the FAC.  (Doc. 21.)  The FAC asserts five claims

8  against LoanCare and CIT: (1) breach of contract; (2) breach of the implied covenant of

9  good faith and fair dealing; (3) violation of the Arizona Consumer Fraud Act ("ACFA");

10 (4) violation of the Real Estate Settlement Procedures Act ("RESPA"); and (5) violation

11 of the Truth in Lending Act ("TILA").  (*Id.* ¶¶ 74-106.)

12       On May 22, 2023, LoanCare moved to dismiss the FAC.  (Doc. 25.)

13       On June 6, 2023, Plaintiff responded to LoanCare's motion.  (Doc. 26.)[2]

14       LoanCare did not file a reply brief and neither side requested oral argument.

15                                  **DISCUSSION**

16 I.   Legal Standard

17       Under Rule 12(b)(6), "to survive a motion to dismiss, a party must allege sufficient

18 factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *In re*

19 *Fitness Holdings Int'l, Inc.*, 714 F.3d 1141, 1144 (9th Cir. 2013) (internal quotation marks

20 omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that

21 allows the court to draw the reasonable inference that the defendant is liable for the

22 misconduct alleged."  *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  "[A]ll

23 well-pleaded allegations of material fact in the complaint are accepted as true and are

24 construed in the light most favorable to the non-moving party."  *Id.* at 1444-45 (citation

25 omitted).  However, the Court need not accept legal conclusions couched as factual

26

27 _____

   [2]    Although this filing was one day late, LRCiv 7.2(c), LoanCare has not objected.
   The Court will deem it filed.  *Cf. Burnett v. Bottoms*, 2006 WL 753159, n.1 (D. Ariz. 2006)
28 ("Since Defendant . . . apparently has no objection to the untimely Response because no
   written objection has been filed, the Court will consider it.").

allegations. *Iqbal*, 556 U.S. at 678-80.  Moreover, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678. The court also may dismiss due to "a lack of a cognizable legal theory." *Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1065 (9th Cir. 2015) (citation omitted).

II.    Counts One And Two

       A.    **The Parties' Arguments**

       LoanCare seeks the dismissal of Count One (breach of contract) and Count Two (breach of the implied covenant of good faith and fair dealing) because the underlying contract (the DOT) was between Plaintiff and CIT, with LoanCare simply acting as "an agent of CIT," and thus "Plaintiff fails to allege the existence of a contract between Plaintiff and [LoanCare]."  (Doc. 25 at 3, 4.)  Separately, LoanCare argues that Plaintiff fails to allege any damages arising from the alleged breaches.  (*Id.*)

       In response, Plaintiff acknowledges that he cannot assert any contract-based claims against LoanCare (or, at least, cannot do so absent evidence that CIT assigned the DOT to LoanCare) and suggests that he did not intend for the FAC to be understood as asserting Counts One and Two against LoanCare: "Plaintiff understands he could have been clearer by putting which Defendant the claim is being asserted [against] in the caption as to each count.  Plaintiff apologizes for any confusion."  (Doc. 26 at 4.)

       B.    **Analysis**

       Given Plaintiff's concessions and clarifications as to Counts One and Two, LoanCare's motion to dismiss those counts is granted.

III.   Count Three

       A.    **The Parties' Arguments**

       LoanCare argues that Count Three (ACFA violation) must be dismissed because the "advisements" that "Plaintiff . . . go into default" and then "fill out multiple applications" were "not made in connection with the sale or advertisement of merchandise."  (Doc. 25 at 4-5, internal quotation marks omitted.)  Alternatively, LoanCare argues that "Plaintiff fails to allege that he actually relied on such advisements . . . that he suffered any alleged injury

as a proximate cause of such advisements, and . . . fails to allege the injuries that he suffered with specificity." (*Id.*)  Finally, LoanCare argues that Plaintiff's claim that the $10 service fees violated A.R.S. § 6-635 "fails because [§ 6-635] does not apply to the HELOC loan in question pursuant to A.R.S. 6-602(B)." (*Id.*)

Plaintiff responds that "Arizona courts have long held that money is merchandise as defined in A.R.S. § 44-1521(5), and a loan is the sale of the present use of money as defined [in] A.R.S. § 44-1521(7)." (Doc. 26 at 4.)  Next, Plaintiff argues that he properly alleged reliance by alleging that he "stop[ped] making his monthly payment based on LoanCare's advisements, filed multiple applications based on LoanCare's advisements, and made three . . . settlement offers based on LoanCare's advisements." (*Id.* at 5.)  Finally, Plaintiff argues the $10 fee is not exempted by A.R.S. § 6-602(B)(3) because Defendants closed the HELOC "within one . . . year of funding the loan (sometime in 2008)" and "[o]nce the revolving line of credit was closed . . . , it was no longer exempt under [this provision]." (*Id.* at 5-6.)

B.    **Analysis**

ACFA "provides an injured consumer with an implied private cause of action against a violator of the act." *Dunlap v. Jimmy GMC of Tucson, Inc.*, 666 P.2d 83, 87 (Ariz. Ct. App. 1983).  The elements of an ACFA claim "are a false promise or misrepresentation made in connection with the sale or advertisement of merchandise and the hearer's consequent and proximate injury." *Id.*

As Plaintiff correctly notes, Arizona courts have held that money qualifies as "merchandise" for purposes of ACFA and that a loan qualifies as a "sale" for purposes of ACFA.  *Villegas v. Transamerica Fin. Servs., Inc.*, 708 P.2d 781, 783 (Ariz. Ct. App. 1985).  However, the conduct at issue here was not the solicitation of a loan by LoanCare. Rather, Plaintiff approached LoanCare about the possibility of modifying an existing loan. Although there is no published authority from an Arizona appellate court on this issue, several state and federal courts have concluded in recent non-precedential decisions that an ACFA claim will not lie in this circumstance.  *See, e.g.*, *Thomas v. Ally Bank*, 2017 WL

6616620, *2 (Ariz. Ct. App. 2017) ("Thomas did not allege fraud in connection with a sale or advertisement of merchandise, but rather in modifying the payment schedule of an existing loan.  Accordingly, Thomas's allegations did not state a claim under § 44–1522(A)."); *Zoldessy v. MUFG Union Bank, N.A.*, 2021 WL 1733398, *3 (D. Ariz. 2021) ("[H]ere there was no sale or advertisement of merchandise . . . [because] Plaintiff contacted his loan servicer regarding forbearance options on an already existing loan.  Thus, this Court finds the communications between Plaintiff and Defendant did not constitute a sale or advertisement under the ACFA and cannot form the basis of Plaintiff's ACFA claim.  The ACFA claim will therefore be dismissed.") (citation omitted); *Jahn v. Caliber Home Loans Inc.*, 2019 WL 7049105, *3 (D. Ariz. 2019), *aff'd*, 840 F. App'x 975 (9th Cir. 2021) ("Because any alleged misrepresentations by Defendants were not made in connection with the sale or advertisement of merchandise, but rather the modification of a preexisting loan, Plaintiffs' fourth claim for relief fails as a matter of law."); *Rich v. BAC Home Loans Servicing LP*, 2014 WL 7671615, *10 (D. Ariz. 2014) ("Money lending is merchandise for purposes of the ACFA.  This case, however, does not involve an offer for a new loan.  Instead, the conduct Plaintiffs complain of concerns communications surrounding potential offers to modify an already existing debt.  BANA's communications with Plaintiffs, therefore, did not concern the sale or advertisement of merchandise, but instead concerned discussions about modifying the payment schedule for merchandise previously purchased.  Plaintiffs have proffered no evidence of a sale or advertisement of merchandise and therefore have failed to articulate a triable ACFA claim.") (citation omitted).  Although some courts have admittedly come out the other way on this issue, *see, e.g.*, *Myrick v. Bank of Am. Corp.*, 2013 WL 12097453, *3 (D. Ariz. 2013), the Court agrees with the analysis set forth in *Thomas*, *Zoldessy*, *Jahn*, and *Rich* and thus concludes that Count Three is, in the main, subject to dismissal.

Finally, to the extent Count Three is also premised on LoanCare's imposition of certain $10 service/processing fees, the claim fails for at least two reasons.  First, although the FAC alleges (Doc. 21 ¶¶ 91-92) that the challenged $10 fees violate A.R.S. § 6-635,

1    which sets forth a list of "allowable fees," A.R.S. § 6-602(B) specifies that the limitations

2    set forth in § 6-635 "do not apply to" various types of loans.   One of the exempted

3    categories of loans is "[a]dvances on open end revolving loans that are secured by the

4    consumer's principal residence with an agreed on credit limit of more than $10,000." *Id.*

5    § 6-602(B)(3).  In his response brief, Plaintiff acknowledges that his HELOC was initially

6    the sort of loan that would fall within this exemption but argues that because his line of

7    credit was closed in 2008, before LoanCare took over as the servicer, it stopped falling

8    within the § 6-602(B)(3) exemption at that time and "became a simple loan for a fixed

9    amount."  (Doc. 26 at 5-6.)  The problem with this argument is that, even if the HELOC

10   stopped qualifying as a § 6-602(B)(3) loan once the line of credit was closed, the best way

11   to characterize the HELOC after the closure would be as a "[c]losed end loan[] of more

12   than $10,000."  Such loans are identified in § 6-602(B)(1) as a different category of loans

13   that are exempted from § 6-635's limitations.  Thus, either way, Plaintiff's reliance on § 6-

14   635 is misplaced.

15          Second, and alternatively, even assuming the challenged $10 service/processing

16   fees were somehow improper under § 6-635, Plaintiff does not explain (nor can the Court

17   discern) how this would entitle Plaintiff to assert a claim against LoanCare under ACFA.

18   As noted, a claim under ACFA requires "a false promise or misrepresentation made in

19   connection with the sale or advertisement of merchandise and the hearer's consequent and

20   proximate injury."  *Dunlap*, 666 P.2d at 87.  A fee charged in violation of regulatory

21   requirements is not a false promise or representation, made in connection with the sale or

22   advertisement of merchandise, that induces reliance.

23   IV.    Count Four

24          A.     **The Parties' Arguments**

25          As noted, Count Four is a claim against LoanCare and CIT for violating RESPA.

26   (Doc. 21 ¶¶ 95-101.)  More specifically, the FAC identifies two regulatory provisions that

27   LoanCare and CIT allegedly violated: 12 C.F.R. § 1024.39(b) and 12 C.F.R. § 1024.41(d).

28

1  (Doc. 21 ¶¶ 96, 98.)

2       LoanCare asserts that Plaintiff's claim under 12 C.F.R. § 1024.39 should be

3  dismissed for three reasons: (1) the regulation "does not confer upon borrowers a private

4  right of action against lenders"; (2) the regulation "only applies to delinquent borrowers,

5  and Plaintiff has failed to allege that he is a delinquent borrower"; and (3) "Plaintiff fails

6  to allege . . . what damages he suffered as a result of the alleged violation." (Doc. 25 at 5-

7  6.) As for the claim under 12 C.F.R. § 1024.41, LoanCare argues it should be dismissed

8  for two reasons: (1) Plaintiff admits that LoanCare identified the reason why each

9  modification application was denied (*i.e.*, his loan "was not a first lien"), and thus

10  LoanCare satisfied § 1024.41's requirement of stating the specific reasons for the servicer's

11  determination; and (2) "Plaintiff fails to allege . . . what damages he suffered as a result of

12  the alleged violation." (*Id.* at 6.)

13       In response, Plaintiff argues that § 1024.39(b) provides a private right of action and

14  that because he was eligible for a loan modification under RESPA, LoanCare was required

15  under § 1024.41(d) to "identify the owner or assignee of the mortgage loan and the specific

16  criteria that the borrower failed to satisfy" but failed to do so. (Doc. 26 at 6-7, emphasis

17  omitted.) Plaintiff conspicuously does not address LoanCare's arguments regarding the

18  absence of damages arising from the alleged RESPA violations. (*Id.*)

19       **B.**   **Analysis**

20       One of LoanCare's dismissal arguments is that, to the extent Count Four is premised

21  on alleged violations of 12 C.F.R. § 1024.39, the claim fails because there is no private

22  right of action to enforce violations of that regulatory provision. This argument raises a

23  complicated question that has never been addressed by the Ninth Circuit and has divided

24  other courts. Some courts agree with LoanCare that no private right of action exists in this

25  circumstance. *See, e.g.*, *Cilien v. U.S. Bank Nat'l Ass'n*, 687 F. App'x 789, 792 n.2 (11th

26  Cir. 2017) ("We also note that—unlike 12 C.F.R. § 1024.41—the regulations set forth in

27  sections 1024.39 and 1024.40 provide no private cause of action."); *Bryant v. Hope Credit*

28  *Union*, 2020 WL 3103974, *2 (S.D. Miss. 2020) ("Plaintiffs invoke 12 C.F.R.

§§ 1024.39(a)-(b) and 1024.40(a)-(b) [but] . . . [t]here is no private cause of action for alleged violations of the RESPA regulations cited by Plaintiffs.  As a result, Plaintiff's RESPA actions against Dovenmuehle and Hope must be dismissed."); *Brown v. Bank of New York Mellon*, 2016 WL 2726645, *2 (E.D. Va. 2016) ("With respect to plaintiff's Regulation X claims in Counts II-V, defendants correctly argue that 12 C.F.R. §§ 1024.35, 1024.39, and 1024.40 do not explicitly provide a cause of action to private individuals."). Others courts have reached the opposite conclusion.  *See, e.g., Canizales v. Wolf Firm*, 2022 WL 1585180, *3 (C.D. Cal. 2022) (acknowledging that "the majority of courts to consider this question have concluded that § 1024.39 does not provide a right of action" but concluding that "there was clear intent to create a private right of action to enforce § 1024.39, and thus declin[ing] to follow the nonbinding decisions of those prior courts"); *Vance v. Wells Fargo Bank, N.A.*, 291 F. Supp. 3d 769, 773 (W.D. Va. 2018) ("Because the Bureau promulgated Section 1024.39 under the authority of RESPA Section 6 and Section 6 confers a private right of action, Section 1024.39 authorizes a private right of action.  Thus, Wells Fargo's Motion to Dismiss the Vances' Section 1024.39 violation claim will be denied.").

The Court finds it unnecessary to wade into this debate because, even assuming there is a private right of action, Plaintiff's § 1024.39 claim is subject to dismissal due to a failure to plead damages.  Under RESPA (which is the statute that, according to the decisions in *Canizales* and *Vance*, provides the foundation for implying a private right of action for violations of § 1024.39), Plaintiff must plead "actual damages."  12 U.S.C. § 2605(f)(1).  *See generally Sitanggang v. Countrywide Home Loans, Inc.*, 419 F. App'x 756, 757 (9th Cir. 2011) ("Sitanggang's [RESPA] claim was properly dismissed because she did not allege facts suggesting that she suffered any actual damages.").  To plead actual damages, Plaintiff must allege "concrete harms caused by the RESPA violation itself, not harms generally resulting from a plaintiff's default."  *Edge-Wilson v. Wells Fargo Bank, N.A.*, 2018 WL 4491138, *4 (N.D. Cal. 2018) (citation omitted).  Here, Plaintiff's theory of why a regulatory violation occurred is that § 1024.39(b) requires servicers to "send a

borrower a written notice within forty-five . . . days after the borrower becomes delinquent and again no later than forty-five . . . days after each payment due date so long as the borrower remains delinquent" but "LoanCare failed to provide these notices timely, or at all." (Doc. 21 ¶¶ 96-97.)  However, the FAC does not allege (and Plaintiff does not attempt to explain in his response brief) why these alleged regulatory violations were harmful to him.  Indeed, the FAC acknowledges that Plaintiff knew he was delinquent (*id.* ¶ 25) and the thrust of some of Plaintiff's other claims is that LoanCare engaged in misconduct by *inducing* him to become delinquent.  Therefore, any alleged failure by LoanCare to provide written notice of Plaintiff's resulting delinquency status could not have resulted in any independent harm, as RESPA requires.  It follows that any portion of Count Four premised on violations of § 1024.39 must be dismissed.  *Gresham v. Wells Fargo Bank, N.A.*, 642 F. App'x 355, 359 (5th Cir. 2016) (declining to resolve whether § 1024.39 is enforceable through a private right of action because "[e]ven [if] it [is], Gresham failed to plead sufficient facts or offer any evidence in support of such claim").

Turning to § 1024.41(d), LoanCare does not question the existence of a private right of action, so the analysis turns on whether Plaintiff has stated a valid claim for relief. Section 1024.41(d), which is entitled "Denial of loan modification options," provides that "[i]f a borrower's complete loss mitigation application is denied for any trial or permanent loan modification option available to the borrower pursuant to paragraph (c) of this section, a servicer shall state in the notice sent to the borrower . . . the specific reason or reasons for the servicer's determination . . . and, if applicable, that the borrower was not evaluated on other criteria."  *Id.*  A servicer need not comply with these requirements more than once if a borrower submits multiple applications while remaining delinquent.  *Id.* § 1024.41(i).

Here, the FAC alleges that Plaintiff remained delinquent throughout the period in which he submitted successive modification applications (Doc. 21 ¶¶ 25-58), so Plaintiff must plead that LoanCare's initial denial letter in November 2018 failed to provide the "specific reason or reasons" that § 1024.41(d) requires.   Plaintiff has not done so.  The FAC acknowledges that the November 2018 letter provided a specific reason for the denial

of Plaintiff's modification request: "The November 13, 2018, letter also informed Plaintiff he was not eligible . . . because the HELOC 'was not a first lien.'" (*Id.* ¶ 35.) This is a specific reason. Although a vague assertion that an application was denied due to unspecified "rules" or "guidelines" is insufficient, *Chau v. Select Portfolio Servicing, Inc.*, 2020 WL 5810439, *3 (D. Mass. 2020), an explanation as simple as that an application was denied due to the "Plaintiff's monthly income" is sufficiently specific to comply with § 1024.41(d). *Ramirez v. Wells Fargo Bank, N.A.*, 2021 WL 9564023, *9 (E.D.N.Y. 2021). Such is the case here.

Plaintiff's arguments to the contrary are unavailing. Plaintiff contends that LoanCare's proffered reason was inadequate because RESPA in fact "includes the modification of secondary liens." (Doc. 26 at 6-7.) But this misses the point. Section 1024.41 is a procedural regulation that simply creates a right to an *explanation*. 12 C.F.R. § 1024.41(a) ("Nothing in § 1024.41 imposes a duty on a servicer to provide any borrower with any specific loss mitigation option. Nothing in § 1024.41 should be construed to create a right for a borrower to enforce the terms of any agreement between a servicer and the owner or assignee of a mortgage loan, including with respect to the evaluation for, or offer of, any loss mitigation option or to eliminate any such right that may exist pursuant to applicable law."). Thus, a servicer complies with § 1024.41(d) by providing the reason for a denial decision. Whether the reason was valid is irrelevant. *See, e.g., Ehrenfeld v. Wells Fargo, N.A.*, 2019 WL 4933631, *3 (E.D.N.Y. 2019) ("[R]egardless of whether plaintiff agrees with defendant's calculation of her income, defendant complied with 12 C.F.R. § 1024.41(d) by providing a reason for denying plaintiff's request for loan modification."); *Sutton v. CitiMortgage, Inc.*, 228 F. Supp. 3d 254, 274 (S.D.N.Y. 2017) ("RESPA . . . regulates many aspects of loss mitigation practices, but does not regulate the correctness of a loss mitigation decision.").

Finally, and alternatively, Plaintiff has also failed to allege facts that plausibly suggest he suffered any damages as a result of the alleged violation of § 1024.41(d). In November 2018, Plaintiff was told categorically that his loan did not qualify for

modification because it was a secondary lien.  This explanation in no way suggested that Plaintiff would get a different answer by applying again.  (Doc. 21 ¶¶ 32-36.)  Nevertheless, Plaintiff proceeded to apply over and over again for modification of the same loan, only to receive similar rejections.  (*Id.* ¶¶ 38-58.)  Although Plaintiff alleges that he disagrees with LoanCare's decision to reject his modification requests and that the decision harmed him, the relevant question here is whether any alleged violation of § 1024.41(d) caused Plaintiff to suffer damages.  *Edge-Wilson*, 2018 WL 4491138 at *4.  The best Plaintiff has done on this issue is to assert that the lack of sufficient explanation "allowed Plaintiff to blindly apply multiple more times," but this conclusory assertion is implausible.  (Doc. 26 at 7.)  The explanation Plaintiff received in November 2018 explicitly informed him that his loan did not qualify for modification.  It makes no sense that this explanation prompted him to keep applying.

V.     Count Five

     A.     **The Parties' Arguments**

LoanCare asserts that "Plaintiff fails to allege that [LoanCare] violated any specific provision of TILA, and fails to allege any specific damages that he suffered as a result of an alleged violation of TILA by [LoanCare].  Therefore, his claim for violations [of] TILA must be dismissed."  (Doc. 25 at 6, internal quotation marks omitted.)

Plaintiff responds that he "has alleged LoanCare was required to implement [a] qualified loss mitigation plan based on standard industry practice as set forth by the guidelines issued by the Secretary of the Treasury under the Emergency Economic Stabilization Act of 2008," and more specifically that "a qualified loss mitigation plan includes a residential loan modification, workout, or other loss mitigation plan, a loan sale, real property disposition, trial modification, pre-foreclosure sale, and deed in lieu of foreclosure, and a refinancing of a mortgage."  (Doc. 26 at 7.)  Plaintiff contends that "only after three . . . years of dealings . . . did LoanCare inform Plaintiff . . . that refinancing was not an available option because it was a servicer," and "[t]his new information . . . is contrary to the requirements under guidelines issued by the Secretary of the Treasury under

the Emergency Economic Stabilization Act of 2008, and if it was part of the CIT requirements should have been made known years prior."  (*Id.* at 7-8.)

       **B.**    **Analysis**

       It is helpful to begin the analysis of Count Five with some background.

       "Congress enacted the Emergency Economic Stabilization Act in the midst of the financial crisis of 2008."  *Markle v. HSBC Mortg. Corp.*, 844 F. Supp. 2d 172, 176 (D. Mass. 2011).  "The centerpiece of the statute, the Troubled Asset Relief Program ('TARP'), delegated to the Secretary of the Treasury broad powers to mitigate the impact of the foreclosure crisis and preserve homeownership. . . .  Acting under this authority, the Secretary introduced the 'Making Home Affordable Program' in February 2009.  Within this initiative is the 'Home Affordable Modification Program' ('HAMP'), which . . . aims to provide relief to borrowers who have defaulted on their mortgage payments or who are likely to default by reducing mortgage payments to sustainable levels.  Under HAMP, loan servicers receive incentive payments for each permanent loan modification completed."  *Id.* (citations omitted).  "The Department of the Treasury and Fannie Mae have issued a series of directives that provide guidance to mortgage servicers implementing HAMP.  Under the guidelines, servicers may identify and solicit borrowers who are in default on their mortgage payments, or soon will be, and evaluate their eligibility to participate in HAMP."  *Id.* at 177.

       Meanwhile, pursuant to "the Helping Families Save Their Homes Act of 2009," Congress "concluded that mortgage servicers must be authorized to modify loans consistent with . . . the HAMP guidelines and objectives."  *Id.* at 184.  To that end, "section 201 of the Act amended the Truth in Lending Act to prescribe that, to the extent that a mortgage servicer owes a duty to investors to maximize the value of residential mortgages, the duty is satisfied when the servicer modifies such mortgages consistent with HAMP criteria."  *Id.* at 184-85 (citations omitted).  Additionally, and as relevant here, § 201 of the Helping Families Save Their Homes Act of 2009 also added the following proviso: "The qualified loss mitigation plan guidelines issued by the Secretary of the Treasury under the

1    Emergency Economic Stabilization Act of 2008 constitute standard industry practice for

2    purposes of all Federal and State laws." *Id.* at 185 (quoting 15 U.S.C. § 1639a(c)).

3           Plaintiff's theory of liability in Count Five appears to be that LoanCare violated this

4    statutory provision—that is, the provision of the Helping Families Save Their Homes Act

5    of 2009 that is codified at 15 U.S.C. § 1639a(c)—by not adopting a qualified loss

6    mitigation plan based on standard industry practices.  According to Plaintiff, if LoanCare

7    had done so, it would have approved his modification request.  The problem with Plaintiff's

8    theory is that § 1639a(c) does not create a legal duty "to comply with HAMP guidelines,

9    or else face lawsuits." *Markle,* 844 F. Supp. 2d at 1184-85.  Indeed, contrary to Plaintiff's

10   assertion that "a servicer" not providing "refinancing . . . is contrary to the requirements,"

11   § 1639a does not require loan servicers to provide loss mitigation.  *Jones v. Premier One*

12   *Funding, Inc.*, 2010 WL 841277, *3 (N.D. Cal. 2010) ("15 U.S.C. § 1639a . . . authorizes

13   loan servicers to modify mortgage loans and engage in other loss mitigation activities, and

14   it establishes a safe harbor to enable such servicers to exercise these authorities.  It does

15   not compel servicers to provide modification assistance to Plaintiffs.") (cleaned up).  In

16   fact, TILA does not even authorize liability against loan servicers like LoanCare, absent

17   circumstances not present here.  *Robinson v. WMC Mortg. Corp.,* 649 F. App'x 636, 637

18   (9th Cir. 2016) ("The district court also correctly dismissed Plaintiffs' TILA claim against

19   Wells Fargo.  The amended complaint . . . alleged that Wells Fargo acted as a loan servicer

20   and did not hold the promissory note.  Accordingly, Plaintiffs failed to state a claim under

21   TILA, which limits civil liability to creditors and, in certain circumstances, their

22   assignees.").

23   VI.    Leave to Amend

24          LoanCare argues that Plaintiff's claims should be dismissed without leave to amend

25   because any amendment attempt would be futile.  (Doc. 25 at 6-7.)  Plaintiff responds that

26   "[n]othing suggested by LoanCare suggests actual futility, other than not being a party to

27   the DOT, which is no longer applicable as explained above.  As such, Plaintiff requests

28   this Court allow for amendment to his First Amended Complaint because the procedural

issues addressed by LoanCare, if granted, can easily be overcome with an amendment. Additionally, the remaining claims at issue in LoanCare's Motion under the ACFA, RESPA, and TILA, were plead[ed] specifically for the first time in Plaintiff's First Amended Complaint when undersigned counsel replaced prior counsel for Plaintiff." (Doc. 26 at 9.)

Rule 15(a) of the Federal Rules of Civil Procedure "advises the court that 'leave [to amend] shall be freely given when justice so requires.'"  *Eminence Cap., LLC v. Aspeon*, *Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003) (citation omitted).  "This policy is 'to be applied with extreme liberality.'"  *Id.* (citation omitted).  Thus, leave to amend should be granted unless "the amendment: (1) prejudices the opposing party; (2) is sought in bad faith; (3) produces an undue delay in litigation; or (4) is futile."  *AmerisourceBergen Corp. v. Dialysist W., Inc.*, 465 F.3d 946, 951 (9th Cir. 2006).

Applying these standards, Plaintiff's request for leave to amend is granted. Although LoanCare may be correct that any amendment attempt would be futile, as Plaintiff's claims against LoanCare are being dismissed based on legal deficiencies that, as far as the Court can tell, could not be cured through the pleading of additional facts, the policy of extreme liberality underlying Rule 15(a) counsels in favor of giving Plaintiff one more chance at amendment.

…

…

…

…

…

…

…

…

…

…

Accordingly,

**IT IS ORDERED** that LoanCare's motion to dismiss (Doc. 25) is **granted**. All of Plaintiff's claims against LoanCare are dismissed.

**IT IS FURTHER ORDERED** that Plaintiff may file a Second Amended Complaint within 14 days of the issuance of this order. Any changes shall be limited to attempting to cure the deficiencies raised in this order and Plaintiff shall, consistent with LRCiv 15.1(a), attach a redlined version of the pleading as an exhibit.

**IT IS FURTHER ORDERED** that if Plaintiff does not file a Second Amended Complaint within 14 days of the issuance of this order, the Clerk shall dismiss LoanCare as a Defendant.

Dated this 26th day of October, 2023.

Dominic W. Lanza
United States District Judge