**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Robert Rozich,<br><br>        Plaintiff,<br><br>v.<br><br>MTC Financial Incorporated, et al.,<br><br>        Defendants. | No. CV-23-00210-PHX-DWL<br><br>**ORDER** |

On October 10, 2024, the Court granted a motion to dismiss filed by First Citizens Bank and Trust Company ("Defendant") but authorized Robert Rozich ("Plaintiff") to file an amended pleading in an attempt to cure the deficiencies identified in the dismissal order. (Doc. 56.) Plaintiff took advantage of that opportunity and filed a new pleading, the Second Amended Complaint ("SAC"). (Doc. 58.) Defendant subsequently filed another motion to dismiss. (Doc. 59.) Plaintiff filed a response. (Doc. 61.) Defendant did not file a reply and neither side requested oral argument.

For the reasons that follow, the motion to dismiss the SAC is granted.

**RELEVANT BACKGROUND**

I.    <u>Overview Of Factual Allegations</u>

In 2007, Plaintiff took out a Home Equity Line of Credit (the "HELOC"). (Doc. 58 ¶ 8.) The terms of the HELOC were set out in an agreement (the "Agreement") and the HELOC was secured by a deed of trust ("DOT"), which in 2010 was assigned to Defendant. (*Id.* ¶¶ 8, 11.) Former defendant LoanCare was the servicer on the HELOC. (*Id.* ¶ 4.)

In 2007, "[u]pon obtaining the revolving line of credit, the entire line of credit [of $150,000] . . . was placed in Plaintiff's bank account without his permission or knowledge." (*Id.* ¶ 16.) "Plaintiff tried to immediately return the funds to the lender, but already having the interest and finance charges assessed on the entire amount of the revolving line of credit Plaintiff transferred all of the funds into his account." (*Id.* ¶ 18.)

Later, after Plaintiff expressed difficulty in making payments on the indebtedness, LoanCare, acting as the agent of Defendant, "informed Plaintiff that he would have to be delinquent three (3) or so months, as he would be in a better position for any modification, before hardship relief would be granted." (*Id.* ¶¶ 22-23.) LoanCare "did not discuss with Plaintiff other options available, including refinance, so that Plaintiff could remain in good standing and continue his monthly payments without issue." (*Id.* ¶ 25.) "Nor did Plaintiff receive the required notice prior to acceleration." (*Id.* ¶ 26, citing Doc. 58-2 at 11.) Plaintiff followed this advice, resulting in delinquency in 2018. (*Id.* ¶ 30.) Around this time, Plaintiff's access to his online loan portal was revoked. (*Id.* ¶¶ 27-28.) Afterward, Plaintiff submitted four "Borrower Response Package/Loss Mitigation" applications, each of which LoanCare rejected, citing Defendant's "eligibility requirements" and the fact that the DOT was not a "first lien." (*Id.* ¶¶ 30-61.) Plaintiff then submitted a fifth and final application in July 2021, which was also denied, with the denial stating "for the first time after three (3) years of dealings, that LoanCare does not offer refinancing, and the only options for Plaintiff were to reinstate the account (also never mentioned before October 15, 2021), a short sale, or a discounted pay off" and "invited Plaintiff to make a settlement offer for a lien release." (*Id.* ¶¶ 62-68.) Plaintiff then attempted to negotiate a settlement with Defendant, but Defendant "refused to ever provide a counteroffer and purposely delayed any responses." (*Id.* ¶ 69.) This delay resulted in Plaintiff going into "considerable arrears which would make his ability to obtain new financing from any institution increasingly difficult to impossible." (*Id.* ¶ 83.)

During this negotiation process, "Defendants negatively reported each 'late payment' and eventually the entire amount of the indebtedness after acceleration of the

indebtedness . . . , destroying Plaintiff's good credit rating." (*Id.* ¶ 84.) "Defendants also began the foreclosure process by recording a Notice of Trustee's Sale noticing the sale of the Property at auction on March 27, 2024." (*Id.* ¶ 85.) "Defendants provided one short extension to the noticed Trustee's Sale to May 1, 2024, but refused to provide any further extension." (*Id.* ¶ 86.) Plaintiff was then "forced to file for bankruptcy on May 1, 2024, to stay the Trustee's Sale and keep the Property where he has lived for decades." (*Id.* ¶ 87.) "Had LoanCare and/or [Defendant] initially told Plaintiff that a second lien would not qualify for any type of hardship relief, or to offer an amount for a discounted payoff and release of lien instead of advising to resubmit multiple applications, then Plaintiff would not have filed his multiple applications, a settlement could have been reached, or Plaintiff would still have been in a position to obtain new financing with [Defendant] or other lender based on his then good credit and equity in the Property." (*Id.* ¶ 88.)

II. The October 10, 2024 Order

Based on those factual allegations, Plaintiff asserted five claims against Defendant in his First Amended Complaint ("FAC"). (Doc. 21.) In the October 10, 2024 order, the Court dismissed all five of those claims for failure to state a claim. (Doc. 56.)

More specifically, the Court dismissed the breach-of-contract claim in Count One because Plaintiff had not pleaded sufficient facts about the underlying loan documents to establish any breach. (*Id.* at 9-10.)[1] The Court dismissed the implied-covenant claim in Count Two for a similar reason—Plaintiff had not pleaded sufficient facts about the underlying loan documents to establish that Defendant had interfered with any reasonably expected benefits flowing from those documents. (*Id.* at 11-12 ["In light of Plaintiff's failure to provide a copy of the DOT or at least plead concrete details about its provisions, Plaintiff has failed to plausibly establish that CIT's conduct deprived him of specific

---

[1] For related reasons, the Court suggested that Plaintiff also failed to adequately plead the duty element of any contract claim: "Plaintiff alleges that certain duties arose from the DOT as a matter of 'common sense,' including the duty to provide a line of credit on a 'revolving nature,' to apply payments in a particular order, and to provide notice of acceleration and/or sale. However, Plaintiff does not provide a copy of the DOT as an attachment to the FAC and fails to tether his allegations to any particular provision within the DOT." (Doc. 56 at 9.)

- 3 -

benefits flowing from the DOT."])  The Court dismissed the Arizona consumer fraud claim in Count Three based on Plaintiff's concession that it was subject to dismissal.  (*Id.* at 13.)  The Court dismissed the RESPA claim in Count Four because Plaintiff conceded that he had failed to plead damages.  (*Id.* at 13-14.)  And the Court dismissed the claim in Count Five because to the extent it was brought under TILA, it would fail as a matter of law, and to the extent it was some sort of negligence claim, Plaintiff did not plead the duty element with any clarity.  (*Id.* at 15-16.)

III.   The SAC

In the SAC, filed on October 24, 2024, Plaintiff made changes intended to cure the deficiencies identified in the October 10, 2024 order.  (Doc. 57-1 [redlined version]; Doc. 58 [clean version].)  Plaintiff added references to specific provisions of the Agreement and the DOT.  (*Id.* ¶¶ 12, 17, 20, 24, 26, 75, 77-80.)  Plaintiff also attached these documents as exhibits.  (Docs. 58-1, 58-2.)  Finally, Plaintiff abandoned his Arizona consumer fraud claim and restyled his former TILA claim as a negligence claim.  (*Id.* ¶¶ 126-39.)

**DISCUSSION**

I.   Standard Of Review

Under Rule 12(b)(6), "to survive a motion to dismiss, a party must allege sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *In re Fitness Holdings Int'l, Inc.*, 714 F.3d 1141, 1144 (9th Cir. 2013) (internal quotation marks omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  When evaluating a Rule 12(b)(6) motion, "all well-pleaded allegations of material fact in the complaint are accepted as true and are construed in the light most favorable to the non-moving party." *Id.* at 1444-45 (quoting *Ashcroft*, 56 U.S. at 678).  However, the court need not accept legal conclusions couched as factual allegations. *Iqbal*, 556 U.S. at 678-80.  Moreover, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678.  The court also may dismiss due to "a

lack of a cognizable legal theory." *Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1065 (9th Cir. 2015) (citation omitted).

II.   Count One—Breach of Contract

   A.   **The Parties' Arguments**

Defendant argues that Count One of the SAC is subject to dismissal for five reasons. (Doc. 59 at 3-4.) "First, any claims pertaining to any alleged breach of the alleged agreements that allegedly occurred prior to December 13, 2016 are time-barred. As such Plaintiff's claims concerning the initial funding, disposition of funds from, and closure of the account in question in 2008 are time-barred." (*Id.* at 4.) "Second, . . . Plaintiff fails to describe, in any detail whatsoever, how any payments were misapplied in connection with his account." (*Id.*) "Third, Plaintiff fails to identify any provision of the alleged agreement that was breached prior to the alleged commencement of the foreclosure process. Although Plaintiff references prerequisites to acceleration at various points in the SAC, he does not allege that the underlying loan was ever, in fact, accelerated." (*Id.*) "Fourth, although Plaintiff alleges that LoanCare allegedly revoked Plaintiff's 'online access,' he fails to identify any provision of the agreements in question that contractually entitle him to 'online access.'" (*Id.*) "Finally, and perhaps most importantly, Plaintiff fails to allege what damages he suffered as a result of an alleged breach, fails to allege how any payments under the deed of trust were misapplied, fails to allege that his loan was accelerated, and fails to allege that foreclosure proceedings were initiated." (*Id.*)

In response to Defendant's first argument, Plaintiff appears to argue that although Defendant may have closed the line of credit before 2016, Defendant's "duty to provide a line of credit able to be used on a revolving nature" was breached beyond 2016 on a continual basis by Defendant not maintaining the availability of a credit line. (Doc. 61 at 4.) In response to Defendant's second argument, Plaintiff argues that paragraphs 75-81, 93, and 97 of the SAC "go[] into detail regarding the applicable provisions of the Loan Documents, citing directly thereto, that govern what charges and fees are allowable, how payments were to be applied, the figures regarding misapplied fees, charges, or payments,

and that [Defendant] added additional charges or misapplied payments that were either excessive or not in accordance with the Loan Documents." (*Id.* at 4-5.) Plaintiff adds that the SAC also "alleges that his online access had been revoked which was the sole way in which Plaintiff had the ability to determine if the correct fees and charges were added or whether the payments were applied correctly. Despite not having access, Plaintiff goes into great detail on how each denial letter stating an amount due is excessive." (*Id.* at 5.) In response to Defendant's third argument, Plaintiff notes that he attached the loan documents to the SAC and "cite[s] directly to the provisions that he alleged [Defendant] breached." (*Id.* at 5-6.) Plaintiff also argues that the SAC does, in fact, allege that the indebtedness was accelerated and that any suggestion to the contrary is "simply incorrect." (*Id.* at 6.) In response to Defendant's fourth argument, Plaintiff argues that Defendant's "failure to provide online access" was a breach of the contractual duty "to send periodic statements showing how any payment was applied or how any fees or charges were being assessed in accordance with Exhibit A at p.2, ¶ 5 . . . [which] was done solely through online access until revoked." (*Id.*) In response to Defendant's fifth argument, Plaintiff argues that under Rule 8(a)(3) of the Federal Rules of Civil Procedure—and cases commenting on the level of specificity required for damages allegations at the pleading stage, including *Seven Words LLC v. Network Sols.*, 260 F.3d 1089 (9th Cir. 2001)—the SAC's allegations "exceed[] the requirements." (*Id.* at 6-7.)

B. **Analysis**

As an initial matter, the Court agrees with Defendant that any breach-of-contract claim premised on a breach that occurred before December 13, 2016[2] is barred by the statute of limitations. "As a matter of public policy, our legislature has determined that claims must be brought within an identifiable period of time, and claims brought thereafter are, absent certain circumstances, too stale to be enforceable." *Porter v. Spader,* 239 P.3d 743, 746 (Ariz. Ct. App. 2010). In Arizona, a six-year statute of limitations applies to

---

[2]   Plaintiff initiated this action on December 13, 2022. (Doc. 1 ¶ 1.) Six years before that date is December 13, 2016.

- 6 -

1 breach-of-contract claims. A.R.S. § 12-548. "As a general matter, a cause of action accrues, and the statute of limitations commences, when one party is able to sue another." *Gust, Rosenfeld & Henderson v. Prudential Ins. Co. of Am.*, 898 P.2d 964, 966 (Ariz. 1995). A statute-of-limitations defense is properly raised in a motion to dismiss "where it appears from the face of the complaint that the claim is barred. The party opposing a motion to dismiss based on a statute of limitations defense bears the burden of proving the statute has been tolled." *McCloud v. State, Ariz. Dep't of Pub. Safety*, 170 P.3d 691, 694 (Ariz. Ct. App. 2007). "[T]he primary policy underlying the statute of limitations is the protection of defendants and courts from litigation of stale claims where plaintiffs have slept on their rights and evidence may have been lost or witnesses' memories faded." *Jepson v. New*, 792 P.2d 728, 734 (Ariz. 1990) (cleaned up).

Plaintiff's pre-2016 contract claim is that Defendant breached the provision of the DOT providing that "[w]hen you request a loan, we will advance exactly the amount you request" (Doc. 58-1 at 2) by placing "the entire line of credit of [$150,000] in Plaintiff's bank account without his permission or knowledge" (Doc. 58 ¶ 16). This advancement of the $150,000 allegedly occurred "[u]pon obtaining the revolving line of credit" (Doc. 58 ¶ 16), which occurred in 2007 (*id.* ¶ 8), and the line of credit was then "close[d] within one (1) year of funding the loan" (*id.* ¶ 19), *i.e.,* in 2008.

Based solely on the face of the complaint, any contract claim premised on the advancement of the $150,000 is barred by Arizona's six-year statute of limitations—the advancement occurred more than a decade before Plaintiff initiated this action. Nor is Plaintiff entitled to equitable tolling—he acknowledges in the SAC that he knew about the advance at the time it occurred and even initially tried to return the funds before begrudgingly accepting them. (*Id.* ¶ 18.)

Instead, Plaintiff offers a theory of "continuous breach," under which Defendant is alleged to have committed a new breach each day it failed to provide an available amount of credit up to the principal, which Plaintiff argues is "generally" required "with all revolving lines of credit." (Doc. 61 at 4.) This argument is unavailing. As Plaintiff

acknowledges in the SAC, the line of credit was closed in 2008. (Doc. 58 ¶ 19.) Even assuming the closure of the line of credit at that time was impermissible under the DOT and thus constituted a breach that is separate and distinct from the advancement of the $150,000—an argument that Plaintiff does not develop in any depth—any contract claim premised on the improper closure of the line of credit would have accrued in 2008. Although it is true that "[i]n certain situations, Arizona courts have relied on the theory of 'continuous breach' in determining when a cause of action begins to accrue," Plaintiff's reliance on that theory is misplaced here because "[u]nder Arizona law, the continuing violation notion is an exception to the statute of limitations, not the rule, and it applies to recurring payments that have become due." *Ancala Holdings, L.L.C. v. Price*, 220 F. App'x 569, 572 (9th Cir. 2007). That is simply not the situation here.

This leaves the alleged contractual breaches that occurred after December 13, 2016. The Court agrees with Defendant that the SAC fails to state a claim as to those breaches. First, although Plaintiff has now provided the underlying loan documents, he has once again failed to explain why some of the challenged conduct breached any provision in those documents. For example, although the SAC alleges that Defendant was required, under the DOT, to apply payments received from Plaintiff in a certain order (Doc. 58 ¶ 75), the SAC's bottom-line assertion that Defendant "breached [its] duty to apply all Plaintiff's payments in the required order" (*id.* ¶ 97) is conclusory because Plaintiff never identifies the order in which his payments were applied—instead, Plaintiff merely alleges that "[u]pon information and belief the payments made by Plaintiff from July 2007 through December 2018 were not applied in accordance with the DOT." (*Id.* ¶ 76.) These allegations are too vague and conclusory to establish that Defendant misapplied Plaintiff's payments in violation of the DOT. Similarly, although the SAC alleges that Defendant breached the DOT by adding "charges to Plaintiff's revolving line of credit that were either excessive or not in accordance with the Loan Documents" (*id.* ¶¶ 81, 102), none of those charges are ever identified—instead, the SAC merely cites the sections of the loan documents that detail how Periodic Finance Charges and other fees are computed and then

alleges that "[u]pon information, Defendants added additional charges to Plaintiff's revolving line of credit that were either excessive or not in accordance with the Loan Documents." (*Id.* ¶ 81.) This is the same sort of vague, conclusory language that resulted in dismissal of Count One of the FAC.

Next, Plaintiff's allegations concerning Defendant's failure to provide notice of acceleration (*id.* ¶¶ 95, 98, 111) fail to state a claim because Plaintiff cannot establish damages in relation to that alleged breach. Plaintiff's theory appears to be that he was entitled to a 30-day cure period under the contract, and by failing to provide him with adequate notice, Defendant deprived him of the opportunity to cure. The problem with this theory is that, although the SAC alleges that Plaintiff was threatened with foreclosure (*id.* ¶ 139), it acknowledges that the foreclosure never occurred and that Plaintiff remains on his property to this day (*id.* ¶ 87). Courts have rejected theories of damages predicated on the failure to provide notice of acceleration when the foreclosure itself never occurred. *Henkels v. J.P. Morgan Chase*, 2011 WL 2357874, *8 (D. Ariz. 2011) ("Because the trustee's sale, originally scheduled . . . did not occur as scheduled, Plaintiff did not suffer damages from Defendants' alleged breach of notification obligations under the Deed of Trust."); *Warren v. Sierra Pac. Mortg. Servs. Inc. FN*, 2011 WL 1526957, *3 (D. Ariz. 2011) ("Plaintiffs have failed to and cannot at this time allege damages stemming from this alleged breach of the deed of trust. Here, Plaintiffs claim that the May 18, 2010 Statement of Breach or Non Performance 'was served upon Plaintiffs after May 18, 2010 . . . giving Plaintiffs no time within which to cure any alleged default in making payments under the Note' and that the notice did not contain the 'required information regarding the Plaintiffs' right to bring a court action' challenging the sale. In this case, the non-judicial foreclosure originally scheduled for August 17, 2010 did not occur. Because the foreclosure did not occur as scheduled, Plaintiffs did not suffer damages from Defendants' alleged breach of notification obligations under the deed of trust; such damages would arise only if foreclosure occurred without the required notice. As Plaintiffs exercised their rights to bring suit challenging the foreclosure sale and have had time to cure their default, they

1  have failed to allege any damages arising from any purported breach of notification
2  obligations.") (cleaned up).

3  Similarly, the SAC's allegations concerning the failure to provide monthly periodic
4  statements (*id.* ¶¶ 94, 100) fail to state a claim due to the absence of damages. Although
5  the SAC alleges that the failure to provide such monthly periodic statements prevented
6  Plaintiff from knowing "how any payment was applied or how any fees or charges were
7  being assessed" (*id.* ¶ 100), the SAC fails to allege how this lack of knowledge caused
8  Plaintiff to suffer any concrete harm. The SAC does not, for example, allege that Plaintiff
9  would have done something different had he known about the fees or the alleged
10 misapplication of his payments. Moreover, as explained above, the SAC does not
11 sufficiently allege how any payment was applied or misapplied or in what way the fees
12 were excessive.

13 For these reasons, Count One of the SAC is dismissed.

14 III.    Count Two—Breach Of The Covenant Of Good Faith And Fair Dealing

15        A.    **The Parties' Arguments**

16 Defendant argues that Count Two of the SAC is subject to dismissal for three
17 reasons. (Doc. 59 at 5.) First, Defendant argues that "the entirety of the alleged acts and
18 omissions in question occurred prior to December 13, 2020 and are, therefore, time-barred"
19 pursuant to Arizona's two-year statute of limitations for implied-covenant claims. (*Id.*)
20 "Second, Plaintiff fails to explain what acts or omissions of Defendant allegedly breached
21 the implied covenant of good faith and fair dealing, and fails to describe how an alleged
22 breach by Defendant prevented him from receiving the benefits and entitlements of the
23 deed of trust in question. Plaintiff's allegations are entirely conclusory [and] devoid of
24 specificity." (*Id.*) Third, Defendant argues that the SAC "fails to allege, with any
25 specificity whatsoever, what damages [Plaintiff] allegedly suffered as a result of
26 Defendant's alleged conduct." (*Id.*)

27 In response to Defendant's first argument, Plaintiff argues that he "alleges acts and
28 omission as late as March 2022." (Doc. 61 at 8.) Plaintiff also appears to argue that even

actions before 2020 should not be time-barred because they "are all part of the same acts and or omissions by [Defendant] throughout" and thus trigger the doctrines of "equitable tolling and/or estoppel." (*Id.*) In response to Defendant's second argument, Plaintiff contends that he has "pleaded that [Defendant] had a long history of wrongful acts against borrowers, including Plaintiff; failed to provide a proper accounting; purposely not applying or misapplying payments; not allowing Plaintiff to exercise rights under the DOT; telling Plaintiff to submit multiple applications for modification knowing all the while they would be denied; failing to notify Plaintiff timely that he could not refinance; and inviting a negotiation while delaying the talks and while reporting Plaintiff negatively to all credit bureaus." (*Id.* at 9.) In response to Defendant's third argument, Plaintiff repeats his citations to Rule 8 and *Network Solutions* and again argues that Defendant is demanding a level of specificity not required at the pleading stage. (*Id.*)

B.  **Analysis**

"Arizona law implies a covenant of good faith and fair dealing in every contract." *Keg Rests. Ariz., Inc. v. Jones*, 375 P.3d 1173, 1186 (Ariz. Ct. App. 2016). "The covenant requires that neither party do anything that will injure the right of the other to receive the benefits of their agreement." *Wagenseller v. Scottsdale Mem'l Hosp.*, 710 P.2d 1025, 1038 (Ariz. 1985). "A party may breach an express covenant of the contract without breaching the implied covenant of good faith and fair dealing." *Wells Fargo Bank v. Arizona Laborers, Teamsters & Cement Masons Loc. No. 395 Pension Tr. Fund*, 38 P.3d 12, 29 (Ariz. 2002), as corrected (Apr. 9, 2002).

Defendant is incorrect that Count Two is governed by a two-year statute of limitations. The implied covenant "arises by operation of law but exists by virtue of a contractual relationship" and is "as much a part of a contract as are the express terms." *Id.* Thus, the statute of limitations for implied-covenant claims is generally the same six-year period that applies to contract claims. *Ball v. Swansen*, 2022 WL 17097582, *2 (Ariz. Ct. App. 2022) ("Because Ball's implied covenant claim was pled and sounds in contract, the superior court erred by subjecting it to the two-year statute of limitations applicable to

tortious bad faith claims rather than the six-year statute of limitations applicable to contractual bad faith claims.") True, Arizona courts have, in limited circumstances, permitted parties to bring actions sounding in tort, rather than contract, for breach of the implied covenant. *Wells Fargo Bank*, 38 P.3d at 29. *See also Taylor v. State Farm Mut. Auto. Ins. Co.*, 913 P.2d 1092, 1094-95 (Ariz. 1996) (bad-faith insurance claim). Although such claims have a two-year statute of limitations, A.R.S. § 12-542, they arise only "where there is a special relationship between the parties arising from elements of public interest, adhesion, and fiduciary responsibility." *Wells Fargo Bank*, 38 P.3d at 29. *See also Ball*, 2022 WL 17097582 at *1. Here, neither party contends that there was the sort of special relationship necessary to support such a claim (and trigger the two-year limitations period).[3]

Nevertheless, on the merits, Count Two still fails to state a claim. All of the allegations concerning the misapplication of payments fail for the reasons discussed in Part II above—they are too vague and conclusory. Plaintiff does not allege how his payments may have been misapplied or how this harmed him.

Many of Plaintiff's other allegations fail for the reasons provided in the October 10, 2024 order, which explained that "the allegation that [Defendant] failed to 'inform[] Plaintiff that LoanCare cannot refinance until October 2021' does not establish that [Defendant] deprived Plaintiff of any benefit flowing from the DOT. It merely identifies an action that Plaintiff views as unfair, and Plaintiff does not allege that the DOT contains a provision that entitles him to the right to receive truthful information about the loan modification process." (Doc. 56 at 12.) Likewise, "as for the allegation that [Defendant] 'negatively report[ed] to credit agencies,' Plaintiff once again fails to show how such conduct might conceivably deprive him of a benefit flowing from the DOT." (*Id.*)

---

[3] Nor would such an argument have merit. *McAlister v. Citibank (Arizona)*, 829 P.2d 1253, 1258 (Ariz. Ct. App. 1992) ("It is well settled in Arizona that the relationship between a Bank and an ordinary depositor, absent any special agreement, is that of debtor and creditor. . . . [T]he evidence only shows that McAlister was Citibank's customer for approximately ten years. Without more, the trial court correctly concluded that as a matter of law no fiduciary relationship existed between these parties.") (cleaned up).

This leaves the allegations concerning the "failure to provide a proper accounting" and the failure to provide notice of acceleration. (Doc. 58 ¶ 111.) As for the former theory, Plaintiff has now (unlike in response to the earlier motion to dismiss) provided the loan documents, which contain specific provisions requiring Defendant to provide monthly periodic statements. (Doc. 58 ¶ 94.)[4] Likewise, as for the latter theory, Plaintiff has now cited provisions in the loan documents requiring Defendant to provide notice in the event of acceleration. (Doc. 58 ¶ 26, citing Doc. 58-2 at 12 ¶ 21.) Nevertheless, Plaintiff's allegations at most describe breaches of certain provisions of the contract, and a breach of a contractual provision does not necessarily equate to a breach of the implied covenant. *Wells Fargo Bank*, 38 P.3d at 29 ("A party may breach an express covenant of the contract without breaching the implied covenant of good faith and fair dealing.") More important, as discussed in Part II above, Plaintiff has not alleged any damages flowing from those particular breaches.

For these reasons, Count Two of the SAC is dismissed.

IV. Count Three—RESPA

A. **The Parties' Arguments**

In Count Three of the SAC, Plaintiff alleges that Defendant violated two discrete provisions of the Real Estate Settlement Procedures Act ("RESPA"): *first*, that Defendant violated 12 C.F.R. § 1024.39(b), which provides that "servicers must send a borrower a written notice within forty-five (45) days after the borrower becomes delinquent and again no later than forty-five (45) days after each payment due date so long as the borrower remains delinquent," by "fail[ing] to provide these notices timely, or at all"; and *second*, that Defendant violated 12 C.F.R. § 1024.41(d), which imposes certain duties upon "a servicer who denies a loss mitigation application for any trial or permanent loan modification option," by "never identif[ying] what specific criteria Plaintiff failed to satisfy." (Doc. 58 ¶¶ 116-25.)

---

[4] Although the provision cited by in the SAC (Doc. 58-1 at 2 ¶ 1) does not explicitly support the proposition that Defendant had a duty to provide monthly periodic statements, a different provision in the Agreement (Doc. 58-1 at 4 ¶ 4) does appear to create such a duty.

As for the first theory, Defendant argues that § 1024.39(b) does not create a private right of action against lenders. (Doc. 59 at 6.) Defendant also argues that "Plaintiff fails to allege, with any specificity whatsoever, what damages he suffered as a result of the alleged violation of 12 C.F.R. § 1024.39." (*Id.*) As for the second theory, Defendant argues that the SAC's allegation that Defendant denied Plaintiff's loss mitigation application on the basis of the loan not being a first lien establishes "that Defendant complied with 12 C.F.R. § 1024.41(d) by stating in the denial notice the specific reasons for the servicer's determination, *i.e.*, because the loan in question was not a first lien." (*Id.*) Defendant also contends, as with the first theory, that Plaintiff fails to allege damages with sufficient specificity. (*Id.*)

As for the first theory, Plaintiff argues that because "this Court has previously explained that whether a private cause of action is allowable under 12 C.F.R. § 1024.39 'has never been addressed by the Ninth Circuit and has divided other courts,'" "this precludes dismissal at this point as a matter of law." (Doc. 61 at 10.) Plaintiff also contends that he has adequately alleged damages because "as a result of [Defendant's] failure to send the required notices timely, or at all, Plaintiff was not aware that the charges and/or fees were not being properly applied or were excessive resulting in a much higher payoff amount. The damages are the same as related to [Defendant's] failure to provide monthly statements regarding the HELOC in breach of the Loan Documents." (*Id.*) As for the second theory, Plaintiff argues that "[a]lthough the November 13, 2018, letter, as alleged in the SAC, provides a specific reason, it may not have been an allowable reason under HAMP . . . and therefore not sufficient to comply with 12 C.F.R. § 1024.41(d)." (*Id.* at 11.)

B. **Analysis**

Plaintiff's claim under 12 C.F.R. § 1024.39(b) is subject to dismissal because, even assuming that a private right of action exists under that provision, Plaintiff has failed to sufficiently plead damages arising from the lack of timely notices. The Court addressed this exact issue when dismissing Plaintiff's § 1204.39(b) claim against a different

defendant during an earlier stage of this case and nothing in the SAC or in Plaintiff's response brief changes that analysis. (Doc. 28 at 11-12, cleaned up ["Plaintiff's theory of why a regulatory violation occurred is that § 1024.39(b) requires servicers to 'send a borrower a written notice within forty-five . . . days after the borrower becomes delinquent and again no later than forty-five . . . days after each payment due date so long as the borrower remains delinquent' but 'LoanCare failed to provide these notices timely, or at all.' However, the FAC does not allege (and Plaintiff does not attempt to explain in his response brief) why these alleged regulatory violations were harmful to him. Indeed, the FAC acknowledges that Plaintiff knew he was delinquent and the thrust of some of Plaintiff's other claims is that LoanCare engaged in misconduct by *inducing* him to become delinquent. Therefore, any alleged failure . . . to provide written notice of Plaintiff's resulting delinquency status could not have resulted in any independent harm, as RESPA requires. It follows that any portion of Count Four premised on violations of § 1024.39 must be dismissed."].)

The analysis in the earlier dismissal order as to Plaintiff's claim under 12 C.F.R. § 1024.41(d) also remains equally valid here. The SAC acknowledges that Plaintiff was provided a specific explanation for why his loan modification application was denied—because it was not a first lien—and Plaintiff simply argues that this wasn't a valid reason. But "Section 1024.41 is a procedural regulation that simply creates a right to an *explanation*. Thus, a servicer complies with § 1024.41(d) by providing the reason for a denial decision. Whether the reason was valid is irrelevant." (Doc. 28 at 13, citations omitted.) Additionally, Plaintiff has failed to plausibly allege damages arising from the alleged § 1024.41(d) violation for the same reasons identified in the earlier dismissal order. (*Id.* at 13-14, citations omitted ["In November 2018, Plaintiff was told categorically that his loan did not qualify for modification because it was a secondary lien. This explanation in no way suggested that Plaintiff would get a different answer by applying again. Nevertheless, Plaintiff proceeded to apply over and over again for modification of the same loan, only to receive similar rejections. Although Plaintiff alleges that he disagrees with

1  [the] decision to reject his modification requests and that the decision harmed him, the
2  relevant question here is whether any alleged violation of § 1024.41(d) caused Plaintiff to
3  suffer damages . . . .  The explanation Plaintiff received in November 2018 explicitly
4  informed him that his loan did not qualify for modification.  It makes no sense that this
5  explanation prompted him to keep applying."].)

6  For these reasons, Count Three of the SAC is dismissed.

7  V.  Count Four—Negligence

8  A.  **The Parties' Arguments**

9  Defendant argues that Count Four of the SAC is subject to dismissal because
10 "Plaintiff fails to allege that Defendant owed any duty to Plaintiff, fails to allege any breach
11 of that duty, fails to allege any connection between any alleged breach and any injury to
12 Plaintiff, and fails to allege any specific damages suffered by Plaintiff.  Therefore, his claim
13 for negligence must be dismissed."  (Doc. 59 at 7.)

14 In response, Plaintiff argues that the SAC alleges that Defendant owed him a duty
15 "to offer a qualified loss mitigation plan which includes a residential loan modification,
16 workout, or other loss mitigation plan, a loan sale, real property disposition, trial
17 modification, pre-foreclosure sale, and deed in lieu of foreclosure, and/or a refinancing of
18 a mortgage."  (Doc. 61 at 11.)  According to Plaintiff, "[t]his standard of care is set forth
19 in the Home Affordable Modification Program ('HAMP').  As such the duty [Defendant]
20 owed to Plaintiff was to fully consider a qualified loss mitigation plan as set forth in
21 HAMP."  (*Id.* at 11-12.)  Plaintiff further contends that Defendant "breached that duty by
22 proceeding with a foreclosure sale on the Property before Plaintiff had been properly
23 evaluated for HAMP eligibility or other qualified loss mitigation plan."  (*Id.* at 12.)  As in
24 the FAC, Plaintiff relies on *Markle v. HSBC Mortg. Corp. (USA)*, 844 F. Supp. 2d 172 (D.
25 Mass. 2011), as support for his theory.  (*Id.* at 11-12.)  Regarding damages, Plaintiff argues
26 that he "tried to be as specific as possible, despite not having access to any current
27 statements, by showing the alleged amounts due after each denial of his modification
28 applications and what the amounts should have been."  (*Id.*)

B. **Analysis**

In the October 10, 2024 order, the Court explained that "even assuming Plaintiff was attempting to assert a negligence claim [rather than a statutory claim arising under TILA], he has not alleged with sufficient specificity the source of [Defendant's] otherwise-owed duty to comply with § 1639a(c). If Plaintiff meant to suggest the source of this duty is the DOT, then the FAC fails to allege this with sufficient specificity for all of the reasons stated earlier regarding Counts One and Two. Courts have not hesitated to dismiss similar claims. *Wright v. Chase Home Fin. LLC*, 2011 WL 2173906, *1 (D. Ariz. 2011) (granting motion to dismiss where 'Plaintiff asserts that HAMP amended her note and deed of trust to impose additional duties on defendants'); *Short v. Chase Home Fin. LLC*, 2011 WL 9160941, *3 (D. Ariz. 2011) (granting motion to dismiss, even though 'Plaintiffs assert that they have not brought suit to enforce HAMP,' because 'this assertion is belied by the complaint's allegations . . . [which] make clear . . . that the central issue in this case is Chase's compliance with HAMP')." (Doc. 56 at 16.) That reasoning remains equally applicable here, and thus Plaintiff cannot establish the existence of a duty as required to sustain a negligence claim. *Markowitz v. Arizona Parks Bd.*, 706 P.2d 364, 366 (Ariz. 1985) ("[A] negligence action may be maintained only if there is a duty or obligation, recognized by law, which requires the defendant to conform to a particular standard of conduct in order to protect others against unreasonable risks of harm.").

In *Markle*, the plaintiffs alleged that the defendant "(1) failed to evaluate their eligibility for a HAMP modification before referring their home to foreclosure, (2) improperly denied them a loan modification, and (3) did not furnish requested NPV data." *Markle*, 844 F. Supp. 2d at 186. The plaintiffs sought to assert a negligence claim based on those allegations, but the district court rejected that claim because the plaintiffs failed to establish the element of duty: "Plaintiffs do not cite to any Massachusetts authority recognizing a duty of care set by HAMP guidelines, the breach of which would expose servicers to liability. It is true, as plaintiffs point out, that under Massachusetts law a statutory or regulatory violation can supply evidence of negligence. But, as another court

- 17 -

in this district recently explained, 'while [the] violation of [HAMP guidelines] may provide evidence of a duty *otherwise owed*, it does not create such a duty in the first place." *Id.* at 185. Like the plaintiffs in *Markle*, Plaintiff does not cite anything in Arizona law (or the loan documents) suggesting that Defendant had a duty to comply with HAMP guidelines. (*See also* Doc. 28 at 16, cleaned up ["The problem with Plaintiff's theory is that § 1639a(c) does not create a legal duty to comply with HAMP guidelines, or else face lawsuits."].)

For these reasons, Count Four of the SAC is dismissed.

## VI. Leave to Amend

Defendant asks the Court to dismiss the SAC without leave to amend. (Doc. 59 at 7.) Although Plaintiff does not request leave to amend in the event of dismissal, the Ninth Circuit has suggested that, in certain circumstances, "a district court should grant leave to amend even if no request to amend the pleading was made." *Ebner v. Fresh, Inc.*, 838 F.3d 958, 963 (9th Cir. 2016) (citation omitted).

The decision whether to grant leave to amend is governed by Rule 15(a) of the Federal Rules of Civil Procedure, which "advises the court that 'leave [to amend] shall be freely given when justice so requires.'" *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003). "This policy is 'to be applied with extreme liberality.'" *Id.* Thus, leave to amend should be granted unless "the amendment: (1) prejudices the opposing party; (2) is sought in bad faith; (3) produces an undue delay in litigation; or (4) is futile." *AmerisourceBergen Corp. v. Dialysist W., Inc.*, 465 F.3d 946, 951 (9th Cir. 2006). With that said, "[t]he district court's discretion to deny leave to amend is particularly broad where plaintiff has previously amended the complaint." *Ascon Props., Inc. v. Mobil Oil Co.*, 866 F.2d 1149, 1160 (9th Cir. 1989).

Leave to amend would be inappropriate here because the Plaintiff has been given multiple opportunities to amend his complaint and the SAC is being dismissed based on deficiencies that could not be cured through the pleading of new facts. *Id.* ("Leave need not be granted where the amendment . . . constitutes an exercise in futility."). Additionally, allowing further amendment would create undue delay in this litigation (which was

initiated in December 2022, over two years ago) and be unfairly prejudicial to Defendant.

Accordingly,

**IT IS ORDERED** that:

1. Defendant's motion to dismiss (Doc. 59) is **granted**.
2. The SAC is dismissed without leave to amend.
3. The Clerk shall enter judgment accordingly and terminate this action.

Dated this 3rd day of January, 2025.

Dominic W. Lanza
United States District Judge